IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA,      )      CR. NO. 10-00333 SOM-RLP
                               )
          Plaintiff,           )      ORDER DENYING MOTION TO
                               )      SUPPRESS STATEMENTS OF
     vs.                       )      DEFENDANT CHARLES FINCH
                               )
CHARLES O. FINCH,              )
                               )
          Defendant.           )
_____ )

ORDER DENYING MOTION TO SUPPRESS
STATEMENTS OF DEFENDANT CHARLES FINCH

I.      INTRODUCTION.

        Defendant Charles O. Finch ("Finch") seeks an order

suppressing statements that he made to agents of the Defense

Criminal Investigative Service ("DCIS") and attorneys from the

Department of Justice ("DOJ") at his workplace in August 2008 and

at his home in April 2009.  Because Finch's statements were

noncustodial and voluntary, those un-Mirandized statements are

admissible at trial.  The motion to suppress Finch's statements

is DENIED.

II.     FINDINGS OF FACT.

        This court held an evidentiary hearing during which it

received oral testimony on June 15 and 16, 2011.  Based on the

live testimony and the exhibits received in evidence, the court

finds the following by a preponderance of the evidence.  The

findings are set forth in numbered paragraphs for ease of future

reference.

1.   This court has before it five exhibits submitted by the Government: (1) DCIS Form 1 Report of Interview (I), dated August 26, 2008 ("Ex. 1"); (2) DCIS Form 1 Report of Interview (II), dated August 26, 2008 ("Ex. 2"); (3) Notes of Interview, August 25, 2008 ("Ex. 3"); (4) DCIS Form 1 Report of Interview, dated April 27, 2009 ("Ex. 4"); and (5) Notes of Interview, April 26, 2009 ("Ex. 5").

2.   DCIS Special Agents Wade Muraoka ("SA Muraoka") and Mitchell D. Berry ("SA Berry") testified on behalf of the Government.  Having observed the manner and heard the substance of their testimony, the court finds SA Muraoka and SA Berry credible.

3.   The relevant interview dates for purposes of this motion to suppress are August 25, 2008, and April 26, 2009. (Finch gave an additional statement during plea negotiations in Washington, D.C., but the Government has agreed not to offer that statement at trial.)

4.   On the morning of August 25, 2008, SA Muraoka and DOJ attorney Mark C. Grundvig ("Grundvig") came to Finch's workplace and asked the front desk to call Finch.  Tr. 1-70. When Finch arrived, SA Muraoka and Grundvig identified themselves and explained the nature of their investigation and the reason they wanted to interview him.  Tr. 1-71.

5.   These initial conversations occurred in the busy

office space of a trucking facility.  Tr. 1-71.  SA Muraoka testified that he asked Finch whether there was a place for them to talk.  Id.  Finch led the investigators upstairs to a large, open, upstairs office area where he agreed to be interviewed. Id.  The area contained some chairs and a table, but was largely an expansive and uncluttered space.  Tr. 1-72.  Finch sat across from the agents with an open area to his right leading to the exit.  Tr. 1-73.  The room was not locked, and no one was prevented from coming and going.  Id.

6.  SA Muraoka explained to Finch that the interview was noncustodial and voluntary and that Finch could stop the interview at any time and for any reason.  Tr. 1-74.  Finch was also informed that he was free to leave at any time, and that he did not have to talk to them that day.  Id.  Finch indicated that he understood the interview was voluntary and that he would speak with the investigators.  Id.  The investigators told Finch that they were looking into allegations that Finch had taken bribe payments relating to military contracts during his deployment to Afghanistan in 2005.  Id.

7.  During the interview, Finch received some phone calls.  Tr. 1-75.  He answered the calls without objection from the investigators.  Tr. 1-75, 76.  The investigators never asked or directed Finch not to take a call; nor did they ask who was calling or what was discussed.  Tr. 1-125.

8.  While SA Muraoka and Grundvig were conducting this interview, DCIS agents were executing a search warrant on Finch's residence.  Tr. 1-77.  When these agents called the interviewers, saying that they were having difficulty disarming the alarm system at Finch's residence, SA Muraoka asked Finch for the alarm code, which Finch provided.  Id.  SA Muraoka then showed Finch the search warrant and the list of items to be seized pursuant to the warrant.  Id.  SA Muraoka asked Finch's permission to resume the interview, and Finch agreed to continue answering questions.  Tr. 1-78.

9.  SA Muraoka and Grundvig conducted the interview in a methodical tone and did not raise their voices.  Tr. 1-78.  Finch was not threatened or coerced at any time.  Tr. 1-79, 80.  The tenor of the interview was professional and respectful.  No one raised his voice, threatened Finch, or suggested that Finch or his family members would go to jail.  Tr. 1-79, 80.

10.  At the end of the interview, Finch was asked for and provided his cell phone number and gave permission to contact him again.  Tr. 1-81.  The investigators then left, and Finch returned to work.  Tr. 1-82.  The entire interview lasted approximately two hours, Tr. 1-78, and is memorialized in a DCIS Form-1, Exhibit 1.

11.  Later that same day, the investigators returned to Finch's workplace to ask follow-up questions in light of

additional information they had received.  Tr. 1-82.  They
repeated their earlier statements about the voluntary and
noncustodial nature of the interview, and again informed Finch
that he was free to decline to answer questions, to stop the
interview at any time, or to leave.  Tr. 1-82, 83.  Finch again
stated that he understood, agreed to answer questions, and led
the investigators back to the upstairs office space.  Tr. 1-82.

        12.  Like the first interview, this second interview
was conducted in a calm and polite manner, without threats,
raised voices, or restraint on Finch.  Tr. 1-84, 85.  Finch
volunteered that he had spoken to his aunt and his sister before
the investigators arrived, and that he had discussed the events
of the day with his family.  Tr. 2-5, 6, ECF No. 185.  Finch was
asked to respond to statements by others implicating him in a
bribery scheme.  This interview lasted about twenty minutes, Tr.
1-83, and is memorialized in a DCIS Form-1, Exhibit 2.  At the
conclusion of the interview, the investigators left, and Finch
returned to work.

        13.  Several months later, on April 26, 2009, SA Berry
and DOJ trial attorney Mark Pletcher ("Pletcher") came to Finch's
residence for another interview.  SA Muraoka had called Finch
several days before the interview and informed him that an agent
wanted to recontact him about his case.  Tr. 1-86.  SA Muraoka
testified that he told Finch an agent wanted to speak with him

about this case and to return some items collected during the search of Finch's home. Tr. 1-86, 96. Finch told SA Muraoka that he would be in town on April 26, 2009, and available at approximately 1:00 p.m. Tr. 1-87. However, Finch was not home when the investigators arrived at that time. Tr. 1-9. Finch was contacted and advised of the investigators' presence, and he returned home shortly afterwards. Tr. 1-10.

14. SA Berry and Pletcher returned to Finch's residence and found Finch seated at his kitchen table, visible through a screen door. Tr. 1-10. Finch came to the door, and SA Berry displayed his credentials and introduced himself as an agent with the Department of Defense. Id. The investigators were wearing informal attire. Tr. 1-9. SA Berry told Finch that he and Pletcher wanted to ask Finch additional questions about his deployment in Afghanistan. Tr. 1-10, 11. Although Muraoka had told Finch that at least one purpose of the interview was to return seized items, neither Berry nor Pletcher had any such items to return. Finch asked SA Berry whether he was armed, and SA Berry responded that he was armed as part of his duties as a law enforcement officer. Tr. 1-11. Throughout the interview, SA Berry's weapon was holstered on his ankle; the weapon was never visible or shown to Finch. Id.

15. Finch agreed to be interviewed and allowed SA Berry and Pletcher to enter his home. Tr. 1-11. While they were

standing in the foyer, SA Berry informed Finch that "this is a noncustodial interview. You are not under arrest today. Don't worry about that. We just want to talk to you. We are not here to conduct a search[.] . . . [I]t's completely voluntary. You don't have to talk to us." Tr. 1-13. Finch agreed to be interviewed and motioned for the investigators to sit in his living room. Tr. 1-13. SA Berry requested a writing surface to use to take notes during the interview, so Finch showed them to the kitchen table. Tr. 1-14.

16. During the interview, Finch was seated at his kitchen table nearest to the door and the open living area of the residence. Tr. 1-14. Finch's path to the door and the rest of the house was unobstructed. Tr. 1-15. The investigators seated themselves around the kitchen table with Finch. Tr. 1-14.

17. Before asking any questions, the investigators again told Finch that the interview was voluntary, that he was free to leave at any time, and that he could stop the interview for any reason. Tr. 1-15. SA Berry informed Finch of the need for honesty and said that he would prefer Finch say nothing if he could not be truthful. Tr. 1-16. Finch agreed to be interviewed and appeared normal during questioning. Tr. 1-16, 17.

18. Pletcher explained to Finch why they were there and laid out the case, discussing bank records and statements made by others that implicated Finch. Tr. 1-42. No one raised

his voice during the interview or threatened or restrained Finch in any way. Tr. 1-17, 18.

19. During the interview, Finch received several telephone calls, some of which he answered, and others of which he screened. Tr. 1-19. Finch also went upstairs during the interview to talk to his girlfriend and remained there for several minutes. Id. He did not ask permission to do that, and neither Berry nor Pletcher objected. Tr. 1-20. This interview is memorialized in a DCIS Form-1, Exhibit 4.

20. The investigators spoke in a conversational tone and maintained a nonconfrontational demeanor. Tr. 1-17. Finch was not handcuffed or patted down; SA Berry did not unholster or refer to his weapon during the interview. Tr. 1-18. Finch and his family were never threatened. Tr. 1-18.

21. Before leaving, SA Berry asked Finch if he could reach him again and asked for his best contact information. Tr. 1-20. After the interview, the investigators left Finch's home, and Finch was free to go about his business.

III.     CONCLUSIONS OF LAW.

A.     Finch was Not Subject to a Custodial Interrogation

1. In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court established the rule that, when a person is "in custody," procedural safeguards must be afforded that person before the person is questioned. Otherwise, the prosecution may

not use what it learns through its interrogation. Id. at 444.
This rule was premised on the Fifth Amendment's privilege against
self-incrimination. The Supreme Court reasoned that the
privilege against self-incrimination is protected by adequately
and effectively advising an individual of his or her rights. See
id. at 467. It is undisputed that Finch was not read or told of
his Miranda rights at any time before, during, or after any of
the interviews.

2. The question here is whether Finch underwent
"custodial interrogation" without having been advised of his
Miranda rights. Whether he was "in custody" while being
questioned by the agents turns on all the circumstances of the
questioning. The ultimate inquiry is whether there was a "formal
arrest or restraint on freedom of movement of the degree
associated with a formal arrest." California v. Beheler, 463
U.S. 1121, 1125 (1983); United States v. Norris, 428 F.3d 907,
912 (9th Cir. 2005) ("A person is in custody only where there is
a formal arrest or restraint on freedom of movement of the degree
associated with a formal arrest."); United States v. Luther, 521
F.2d 408, 410 (9th Cir. 1975) ("By 'custodial interrogation' the
Miranda Court meant questioning initiated after a person was
taken into custody or otherwise deprived of his freedom in any
significant way.").

3. A defendant is in custody when, based upon a review

of all the pertinent facts, a reasonable innocent person in such
circumstances would conclude that after brief questioning he or
she would not be free to leave." <u>United States v. Wauneka</u>, 770
F.2d 1434, 1438 (9th Cir. 1985) (quotations omitted); <u>accord</u>
<u>United States v. Hernandez</u>, 476 F.3d 791, 796 (9th Cir. 2007)
("An individual is in custody if considering the circumstances
surrounding an interrogation a reasonable person felt he or she
was not at liberty to terminate the interrogation and leave."
(quotation and ellipses omitted)), <u>cert. denied</u> 128 U.S. 265
(2007).  This is an objective, rather than a subjective,
standard.  <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)
("the initial determination of custody depends on the objective
circumstances of the interrogation, not on the subjective views
harbored by either the interrogating officers or the person being
questioned"); <u>United States v. Bassignani</u>, 575 F.3d 879, 883 (9th
Cir. 2009); <u>United States v. Booth</u>, 669 F.2d 1231, 1235 (9th Cir
1981).

    4.  Facts relevant to the determination of whether a
person is in custody "'include the language used by the officers,
the physical characteristics of the place where the question
occurs, the degree of pressure applied to detain the individual,
the duration of the detention, and the extent to which the person
was confronted with evidence of guilt.'"  <u>United States v.</u>
<u>Hernandez</u>, 476 F.3d 791, 796 (9th Cir. 2007) (<u>quoting</u> <u>United</u>

States v. Butler, 249 F.3d 1094, 1099 (9th Cir. 2001)); accord
United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001)
("Factors relevant to whether an accused is 'in custody' include
the following: (1) the language used to summon the individual;
(2) the extent to which the defendant is confronted with evidence
of guilt; (3) the physical surroundings of the interrogation; (4)
the duration of the detention; and (5) the degree of pressure
applied to detain the individual.").

5. After reviewing the record, the court concludes
that Finch was not in custody during the interviews on August 25,
2008, and April 26, 2009.

6. When investigators arrived at Finch's workplace on
August 25, 2008, they asked Finch for permission to speak with
him about his deployment in Afghanistan. They explained the
nature of their investigation before asking for his voluntary
consent to a noncustodial interview. Finch agreed to answer
questions and led investigators to a large, open conference room
and selected his seat at the table. His exit from the table and
the room was unblocked, and the room was open. Before the
interview began, Finch was explicitly told that he was free to
stop the interview and to leave at any time.

7. Later that afternoon, the investigators returned to
Finch's workplace for a follow-up interview. Finch agreed to
answer additional questions and led investigators to the same

upstairs conference room.  Finch was again reminded that the
interview was voluntary, that he could stop the interview at any
time, and that he was free to leave.  Finch stated that he
understood and proceeded to answer a number of related follow-up
questions.

    8.  In United States v. Bassignani, 575 F.3d 879 (9th
Cir. 2009), the Ninth Circuit found voluntary and noncustodial an
interview conducted in a conference room at the defendant's
workplace while other agents executed a search warrant at the
defendant's workstation and at his home.  In Bassignani, the
agents had not notified the defendant that the interview was
voluntary or that he was free to leave.  The Ninth Circuit
nevertheless found that the "overall tenor of the interrogation
was not coercive," and thus the interview was noncustodial.  Id.
at 887.  Moreover, the officers had not prevented anyone from
coming or going during the interview.  Id. at 885.

    9.  Finch's interviews on August 25, 2008, occurred in
the familiar setting of his workplace, in an office space of his
choosing.  Finch was not kept from leaving, and the investigators
did not take any steps to restrict his movements.  Finch was
never threatened, handcuffed, or patted down.  The investigators
did not display or unholster any weapons.  The investigators
engaged Finch in a cordial, professional, and respectful manner.

    10.  The interview on April 26, 2009, was at Finch's

12

home at a pre-arranged time.  SA Berry identified himself, showed

Finch his credentials, and described the nature of the visit.

Before the start of the interview, Finch was twice told that he

was free to leave and that he could terminate the interview at

any time.  Neither SA Berry nor Pletcher restrained or threatened

Finch.  During the interview, Finch went upstairs once to consult

his girlfriend.  Finch's girlfriend was similarly able to come

and go as she pleased.  See United States v. Gregory, 891 F.2d

732, 735 (9th Cir. 1989) (finding no custodial setting where the

defendant "consented to be interviewed in his house, he was

interviewed in the presence of his wife, the interview lasted

only a brief time, and no coercion or force was used"); United

States v. Brunn, 2008 WL 4628295, at *2, 4 (D. Haw. Oct. 20,

2008) (finding no custody during an in-home interview conducted

while the home was searched by 10 armed law enforcement officers

and noting that a person may "feel freer to assert his or her

rights in the home"); United States v. English, 2008 WL 351209,

at *4 (D. Haw. Feb. 7, 2008) (finding no custodial encounter

where defendant was found at his home during the execution of

search warrant, handcuffed, and transported to DEA office for

questioning, but noting that agents informed defendant of the

voluntary nature of the interview).

        11.  Citing United States v. Craighead, 539 F.3d 1073,

1082-83 (9th Cir. 2008), Finch argues in his Supplemental

Memorandum on the Motion to Suppress that, far being a
noncustodial environment, the home may be a custodial place to be
interviewed because being told one is free to leave when one is
home is meaningless if the place one would normally leave for is
home.  The court is unpersuaded.  Finch was not just told that he
could leave.  He was also told that he did not have to answer any
questions and could end the interview at any time.  He was
allowed to walk to other parts of the home, to talk on the phone,
and to select where in the home to be interviewed.  His
girlfriend was also in the home.  These circumstances do not
suggested a custodial environment.

    12.  Nor is the court persuaded that what Finch calls
the "ruse" of indicating that seized items would be returned
somehow should affect the court's determination.  Nothing about
the "ruse" placed restraints on Finch.  And Muraoka testified
that he also told Finch that there would be further questioning.

    13.  After examining the circumstances surrounding the
interviews on August 25, 2008, and April 26, 2009, the court
concludes that Finch was not subject to a "formal arrest or
restraint on freedom of movement of the degree associated with a
formal arrest."  See Stansbury v. Calif., 511 U.S. 318, 322
(1994) (per curiam) (citation and internal quotation marks
omitted).  Before each interview, Finch was specifically informed
of the noncustodial nature of the interviews.  See United States

14

v. Norris, 428 F.3d 907, 912 (9th Cir. 2005) (defendant was not
in custody when "[h]e was told that his cooperation was voluntary
and that he was free to terminate the interview at any time");
United States v. Manning, 2007 WL 2694344, at *6 (D. Haw. Sept.
4, 2007) (defendant was not in custody because, among other
things, she was advised that interview was voluntary).  See also
United States v. Brown, 441 F.3d 1330, 1349 (11th Cir. 2006)
(when a suspect was told by officers that he was not in custody
and was free to leave, evidence of "extensive" restraint was
necessary to establish that that suspect was in custody); United
States v. Salvo, 133 F.3d 943, 951 (6th Cir. 1998) (statement to
suspect that he was not under arrest, was free to leave at any
time, and would not be arrested at the end of the interview was
an "important factor" in the custody determination); United
States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (the "most
obvious and effective means" of demonstrating that a suspect is
not in custody "is for the police to inform the suspect that an
arrest is not being made and that the suspect may terminate the
interview at will").

        14.  During the interviews in Finch's workplace and
residence, the atmosphere was nonconfrontational, and Finch
appeared relaxed throughout.  Nothing suggested any inability on
his part to leave if he desired.  See United States v. Rodriguez-
Preciado, 399 F.3d 1118, 1127 (9th Cir. 2005).  Finch's receipt

and answer of calls from his cell phone during the interviews and his contact with his girlfriend indicate Finch's awareness of his freedom to leave.  See United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004).  See also United States v. Redlightning, 624 F.3d 1090, 1103 (9th Cir. 2010) (questioning was noncustodial even though agents conducted a pat-down search).  Under these circumstances, a reasonable person would not have believed that he or she was in custody during any of the interviews in issue.

> B.    Finch's Statements Were Voluntary.

15.   A statement is involuntary if, given the totality of the circumstances, a suspect's will and self-determination were overborne by coercive police activity.  Haynes v. Washington, 373 U.S. 503, 513-14 (1963); Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).

16.   No evidence at the suppression hearing suggests that Finch's will was overborne by coercive police activity. Finch was never prevented from leaving, and the investigators took no steps to restrict his movement or his ability to enter or leave any room in which he was interviewed.  No threats or violence were used against Finch or his family.  The investigators acted professionally throughout the interviews. There is no evidence that the agents used improper inducement or coercion such that Finch's will was overborne.  Finch was shown evidence uncovered by the investigation such as his own bank

records, but, given the investigators' express statement that
Finch could leave, that evidence did not exert any undue pressure
that would have caused a reasonable person to believe his ability
to leave was restrained. See United States v. Hayden, 260 F.3d
1062, 1064, 1066 (9th Cir. 2001) (rejecting argument that
defendant was in custody where she was confronted with bank
records indicating her guilt during an interview at law
enforcement offices). Again, Finch demonstrated that he knew he
was free to leave by actually leaving the interviews either to
receive phone calls or to see other people. See United States v.
Crawford, 372 F.3d 1048, 1066 (9th Cir. 2004).

17. In Craighead, the Ninth Circuit identified four
factors that guide the determination of the voluntary nature of
an in-home interrogation: "(1) the number of law enforcement
personnel and whether they were armed; (2) whether the suspect
was at any point restrained, either by physical force or by
threats; (3) whether the suspect was isolated from others; and
(4) whether the suspect was informed that he was free to leave or
terminate the interview, and the context in which any such
statements were made." 539 F.3d 1073, 1084 (9th Cir. 2008).

18. Applying Craighead, this court concludes that
Finch's statements at his residence were voluntary. The
interview was conducted by one DCIS agent and one DOJ attorney.
SA Berry was armed, but only because he was required to be as

part of his law enforcement responsibilities.  He never showed, brandished, or unholstered the gun.  Finch was not restrained physically or through threats, and was not isolated.  Finally, Finch was specifically told twice that he was free to leave or to terminate the in-home interview.  <u>See also</u> <u>United States v. Orman</u>, 486 F.3d 1170, 1176 (9th Cir. 2007) (finding interview was voluntary even though defendant was not informed of his right to leave).

19.  Overall, the explicit warnings, minimal personnel present, familiar surroundings, and nonthreatening, noncoercive nature of the interview indicate that Finch made his statements voluntarily.

C.    Finch's Statements Not Made in the Context of Plea Negotiation and Not Barred under Rule 11 or Rule 410.

20.  For the first time in his Supplemental Memorandum on the Motion to Suppress, Finch argues that he made each of the three statements at issue as part of plea negotiations and therefore they should be suppressed.  <u>See</u> Def. Supp. Memo. at 14-17.

21.  To determine whether statements were made as part of plea negotiations, and are therefore inadmissible under Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410, the Ninth Circuit has set forth a two-part test: (1) the defendant must exhibit an "actual subjective expectation

to negotiate a plea" during the discussion; and (2) the defendant's expectation of a plea agreement must be reasonable under the totality of the objective circumstances. <u>United States v. Pantohan</u>, 602 F.2d 855, 857 (9th Cir. 1979).

22. There is no evidence that Finch exhibited an expectation that he was negotiating a plea. Presenting no evidentiary support, Finch argues that "he expected . . . that 'confessing' and implicating others would be rewarded by a more favorable outcome for himself." Def. Supp. Memo. at 16. But this expectation, even if true, is not equivalent to a belief that he was in the process of negotiating a specific outcome relating to specific criminal charges. <u>See</u> <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1367 (9th Cir. 1988) (offering to cooperate with the FBI is not equivalent to offering to plead guilty). Moreover, an expectation of a plea agreement would not be reasonable under the circumstances because at no point in any of the three interviews did anyone mention a plea agreement, criminal charge of any kind, or possible sentence. <u>See</u> Tr. 2-17.

23. The court also concludes that the investigators' attempts to garner Finch's "cooperation" does not mean that Finch had a subjective expectation of a plea negotiation. Finch points to SA Berry's testimony that the interviewers went to Finch's home for the third interview to get him to become a cooperating witness. <u>See</u> Tr 1-35, 36. Both SA Muraoka and Berry testified

that they wanted to build a rapport with Finch to get him to become a cooperating witness. <u>See</u> Tr. 1-7, 2-18. But general conversations with law enforcement and government agents are not plea negotiations, even when agents request the defendant's "cooperation." <u>Pantohan</u>, 602 F.2d at 856, 857 (not suppressing statement by defendant who apparently felt that "the only way out" was to cooperate).

24. Statements made as part of "cooperation" are distinct from those made in plea negotiations, when charges and specific recommendations are discussed. <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1368 (9th Cir. 1988). Even if the agents wanted Finch to become a cooperating witness, under <u>Guerrero</u>, Finch's subjective expectation is what matters. Finch fails to demonstrate such an expectation.

25. While Finch complains that prosecutors who acted as interviewers are now acting as counsel in this case, there is no evidence that Finch knew at the time of the statements who the trial attorneys would be. Thus, any interviewer's present status as trial counsel could not have influenced Finch at the time of the statements. The status of interviewers as Assistant United States Attorneys does not render every interview they conduct a plea negotiation. Finch provides neither law nor evidence to the contrary.

IV.     <u>CONCLUSION.</u>

For the foregoing reasons, Charles Finch's motion to suppress interview statements is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, July 8, 2011.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

<u>United States of America v. Finch, et al.</u>, Criminal No. 10-00333 SOM/RLP; ORDER DENYING MOTION TO SUPPRESS STATEMENTS OF DEFENDANT CHARLES FINCH.